### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**ANDRE WILSON,**

        **Plaintiff,**

**v.**                                **Case No. 2:13-cv-20692**

**C.O. ANDREW HUDSON,**
**MAJOR RHODES, SGT. MILLER,**
**MICHAEL JAROSZ,**

        **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court is the defendants' Motion for Summary Judgment (ECF No. 117). This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

### PLAINTIFF'S ALLEGATIONS AND RELEVANT PROCEDURAL HISTORY

The plaintiff's Complaint alleges that, on June 5, 2013, the plaintiff, who was then housed in the Quilliams II segregation unit at the Mount Olive Correctional Complex ("MOCC")[1], awoke with chest pain and shortness of breath. (ECF No. 2, ¶¶ 1, 2). Thus, he pushed his emergency call button in his cell. (*Id.*) Several correctional officers entered the pod to find water all over the floor because several inmates were flooding their toilets. (*Id.*, ¶ 3). The plaintiff alleges that he yelled out to Corp. Andrew

---

[1] The plaintiff is presently on parole and is living in Wheeling, West Virginia.

Hudson and Sgt. Miller[2], trying to get medical attention, but he was ignored.  (*Id.*, ¶¶ 4, 5).

The plaintiff's Complaint further alleges that, eventually, Hudson and Miller came up the stairs to the plaintiff's cell and asked him what he wanted.  (*Id.*, ¶ 11).  When the plaintiff stated that he was having chest pains and shortness of breath, Hudson said, "I don't have time for your bullshit, Wilson.  Go sit on your fucking bunk Wilson.  Now go sit on your bunk." (*Id.*, ¶ 13).  The plaintiff alleges that he continued to try to tell them that he needed medical attention, at which time Hudson directed Miller to open the plaintiff's bean hole and Hudson grabbed a can of mace (hereinafter "OC" or "pepper spray") and sprayed the plaintiff.  (*Id.*, ¶¶ 14, 15).

The plaintiff alleges that Hudson sprayed him "excessively," stopped for one or two seconds and continued "hosing me and my cell down."  (*Id.*, ¶ 17).  The plaintiff further alleges that Miller slammed his bean hole shut and "kind of giggled saying 'let's go get the pepper ball gun.'" (*Id.*, ¶ 18).  Hudson and Miller then left the pod.  (*Id.*, ¶ 19).

The plaintiff further alleges that he was left in his cell for 20-25 minutes, choking and struggling to breathe, when Hudson and Miller returned with several other officers and a K-9.  (*Id.*, ¶¶ 20, 21).  The plaintiff alleges he was ordered to "strip out" and to squat and cough, and that he complied with those directives.  (*Id.*, ¶ 23).  However, the plaintiff alleges that he had to ask for the directives to be repeated because he could not hear over the loud barking of the dog outside his cell.  (*Id.*, ¶ 24).  The plaintiff further alleges that, after he complied with the officers' directives, he was handcuffed, shackled and led out of the pod to the Quilliams II recreation yard, where a nurse was waiting to

---

[2]  The plaintiff's Complaint identified defendant Hudson as a "Correctional Officer" and defendant Miller as "Cpl. Miller."  The defendants' documents identify defendant Hudson as "Corp. Hudson" and defendant Miller as "Sgt. Miller."  The undersigned will refer to the defendants either by only their last names or by the titles provided by the defendants.

decontaminate him.  (*Id.*, ¶¶ 26, 27).

The plaintiff further alleges that, after the nurse left, Major Rhodes ordered the plaintiff to sit in a chair and not move, or else he would be sprayed again.  The plaintiff acknowledged these instructions, despite the fact that he was still feeling the effects of the pepper spray.  The chair was situated inside a cage in the recreation yard and the plaintiff was locked in, handcuffed behind his back, and shackled.

Less than one hour later, the plaintiff alleges that he told Officer Jarosz that he needed to go to the bathroom, and Jarosz told him to "hold it."  (*Id.*, ¶¶ 38, 39).  However, the plaintiff alleges that, after about 20 minutes, he was in so much pain that he was forced to urinate on himself.  (*Id.*, ¶ 42).  The plaintiff further alleges that, approximately 10 minutes later, he stood up in the cage to stretch because he was stiff and sore, but was ordered to sit down by Jarosz.  (*Id.*, ¶ 44).  He further alleges that he was immediately pepper sprayed by Rhodes, who allegedly told the plaintiff, "Now you move again, I dare you.  I'll send the dog in there on your ass, boy."  (*Id.*, ¶ 48).  The plaintiff further alleges that he continued to ask for medical care, but Jarosz threatened him with "more of the same if he moved again."  (*Id.*, ¶¶ 50-52).  Eventually, a nurse did come to squirt more water on the plaintiff; however, the plaintiff claims that it did not alleviate his pain.  (*Id.*, ¶¶ 54, 55).

The plaintiff further alleges that, when the plaintiff was ultimately released to return to his cell, Major Rhodes continued to threaten him with additional pepper spray and also said, "Now, boy, if you make one more move I don't like, this dog is gonna chew you a new asshole, are we clear?"  (*Id.*, ¶ 58).  The plaintiff further alleges that his cell had not been cleaned and there was pepper spray everywhere.  (*Id.*, ¶ 61).  He further contends that he was refused a shower and denied cleaning supplies and clean clothes

for three days.  (*Id.*, ¶¶ 62, 63).

The plaintiff's Complaint alleges that (1) the two deployments of pepper spray against the plaintiff by defendants Hudson and Rhodes, (2) defendant Miller's failure to intervene during the first incident, and (3) the failure of defendants Rhodes and Jarosz to ensure that the plaintiff received adequate medical treatment violated his Eighth Amendment rights to be free from cruel and unusual punishment.  The plaintiff further asserts that Hudson and Rhodes' actions constituted an assault and battery under West Virginia law.

On February 24, 2015, the defendants filed a Motion for Summary Judgment (ECF No. 116) and a Memorandum of Law in support thereof (ECF No. 117).  Pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was previously advised of his right and obligation to file a response to any such motion.  (ECF No. 103).  On March 5, 2015, the plaintiff filed his Response in Opposition to the defendants' Motion for Summary Judgment (ECF No. 121).  On May 14, 2015, the defendants filed a Reply (ECF No. 127).[3]

## **STANDARD OF REVIEW**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the

---

[3]   The defendants' Reply asserts that pages 21-29 of the plaintiff's Response should be stricken as exceeding the 20-page limit set forth in Local Rule 7.1 of the Local Rules for the United States District Court for the Southern District of West Virginia.  However, because the plaintiff's Response addresses multiple claims against multiple defendants and because the plaintiff is proceeding pro se, the undersigned believes that the court should grant the plaintiff leave to exceed the page limit.  Accordingly, the defendants' request to strike pages 21-29 of the plaintiff's Response should be denied.

> movant is entitled to judgment as a matter of law.  The court should state
> on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

> A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that

the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## ANALYSIS

**A.    The plaintiff's Eighth Amendment claims against defendants Hudson and Rhodes or Jarosz concerning the alleged use of excessive force fail as a matter of law.**

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  This is a low standard.  The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'"  *Id.* at 833.  The Supreme Court, however, rejected an argument that an objective test of deliberate indifference be established.

6

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.  Thus, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety."  *Id.* at 834. (Citations omitted.)  The negligent failure to protect inmates from violence will not suffice.  *Pressly*, 816 F.2d at 979.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 6.  The majority opinion noted that "[t]he objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" *Id.* at 8. [Citation omitted.]

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  [Citation omitted.] This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.  Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today. * * *

7

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. [Citation omitted.] The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." [Citations omitted.]

*Id.*, at 9-10.  Near the conclusion of the *Hudson* opinion, Justice O'Connor wrote: "To deny, as the dissent does, the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity, civilized standards, humanity and decency' that animate the Eighth Amendment."  *Id.*, at 11.

The *Whitley* case involved a riot at the Oregon State Penitentiary where a prison officer was taken hostage.  In an attempt to free the hostage, a plan was put in place for an unarmed prison security manager to enter the cell block where the hostage was being held, followed by prison officers armed with shotguns.  The security manager ordered one of the armed officers to fire a warning shot and to shoot low at any inmates found climbing the stairs in the direction of the security manager.  During this rescue attempt, one of the officers shot an inmate in the left knee.  The inmate filed suit in federal court, and at the conclusion of a jury trial, the District Court directed a verdict for the defendants.  The Court of Appeals subsequently reversed that ruling and remanded the case to the District Court for a new trial.  The Supreme Court granted certiorari, and ultimately found no Eighth Amendment violation.  The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.  The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and

8

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547). Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury." *Id.* at 322.

The defendants' Motion for Summary Judgment (ECF No. 116) and Memorandum of Law in support thereof (ECF No. 117) assert that the use of pepper spray against the plaintiff at two separate times on June 5, 2013 was a reasonable amount of force under the circumstances, and was done in a good faith effort to restore order in the prison unit. Accordingly, the defendants assert that the plaintiff cannot successfully establish that defendants Hudson and Rhodes violated his Eighth Amendment rights. The defendants' Memorandum of Law states:

> The infliction of pain in the course of a prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable and hence unnecessary in the strict sense. [*Whitley*, 475 U.S. at 319]. "Prison officials do not violate the U.S. Const. Amend VIII whenever it appears in retrospect that the infliction of pain during a security measure could theoretically have been avoided." *Id.* at 319. The U.S. Supreme Court has found that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed.2d 156 (1992).

(ECF No. 117 at 8).

The defendants' Memorandum of Law identifies and discusses five factors set forth in *Whitley* that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm. (*Id.*) The five factors identified by the

Supreme Court to be used in making this determination are: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996). (*Id.*) The defendants' Memorandum of Law addresses the constitutionality of both deployments of pepper spray against the plaintiff on June 5, 2013 under these factors.

As justification for the need for the use of force against the plaintiff, the defendants' Memorandum of Law largely focuses on the plaintiff's violent institutional history, which consists of at least 36 rules violations, including 13 assaults, and the circumstances on the plaintiff's unit at the time of this incident.[4] (ECF No. 117 at 1-3). The defendants' Memorandum of Law addresses the first *Whitley* factor in relation to the plaintiff's case as follows:

> With regard to the first part of the test, it is clear that there was a highly volatile situation in the Quilliams units at [sic; as] mass cell searches were being conducted in order to restore order to the segregation units. This need to restore order was warranted by the simple fact that thirty-two (32) make-shift weapons were confiscated within the Quilliams units.[5] The Plaintiff himself testified that numerous inmates in the Pod were kicking their doors and screaming. Additionally, the Plaintiff testified that when the Correctional Officers entered the Pod they had to wade through trash and water, which obviously resulted from inmates throwing trash from their cells and flooding from their toilets.
>
> The Plaintiff concedes that he was given orders to get away from his door and sit on his bunk.    In fact, the Plaintiff not only concedes that he

---

[4]   During his deposition, the plaintiff was questioned extensively about and acknowledged his lengthy record of violent institutional infractions. (ECF No. 116, Ex. A). The plaintiff also acknowledged that his unit had been on lockdown for 4-5 days at the time of this incident. (*Id.*)

[5]   The defendants' exhibits include an Affidavit of Major Robert Rhodes entered in another civil action filed in this court describing the weapons confiscated during the cell searches. (ECF No. 116, Ex. B). The defendants' exhibits also include photographs of the confiscated weapons. (EC F No. 116, Ex. C). There is nothing in the record to indicate that any of these weapons were confiscated from this plaintiff, Andre Wilson.

received such orders but also admits that he failed to comply, instead
staying at the door and attempting to continue engaging the Correctional
Officers in conversation.

      The need for the use of OC is clear.  Plaintiff, an inmate convicted of
a violent crime and with a long history of violent offenses within the
WVDOC, was housed in the segregation unit of a maximum security
prison.  A mass cell search was being conducted to recover contraband
such as weapons from the possession of inmates.  Not only did the
Plaintiff's actions in banging on his door and yelling across the Pod
contribute to the disturbance in the Pod, it prevented these Correctional
Officers from carrying out their then pressing duties of searching each and
every cell in the Pod for weapons and other contraband.

      In the instant matter, the Plaintiff concedes he was given orders to
step clear of the door and sit on his bunk.  Despite this order, he continued
to cause a disturbance and pull the Correctional Officers away from the
duty at hand and contributed to the general disturbance in the Pod.

(*Id.* at 9).   The defendants have also provided Corp. Hudson's Incident Report

concerning this use of force, which states as follows:

On Wednesday, 05 June 2013, I (Corporal Andrew Hudson) was working
my assigned post at the Mount Olive Correctional Complex in the
Quilliams Two Unit conducting cell searches in Pod 5.  At approximately
0742 hours I proceeded to Cell 515 and ordered Inmate Andre Wilson #
43162 to quit hitting his door, sit on his bunk, and to quit yelling across
the pod.  Inmate Andre Wilson # 43162 began displaying verbal non
compliance and would not follow the orders that I had given him.  At
approximately 0742 hours, I deployed two one second bursts of Oleoresin
Capsicum from a Sabre Red Mark IX (Serial Number 2059308).  I then
backed away from the cell and was ordered by the Team Leader to relieve
myself from the area.  I was not part of the decontamination process for
Inmate Andre Wilson # 43162.  I have no injuries to report at this time.
End of Report.

(ECF No. 120, Ex. E).   There is no other evidence of record, sworn or otherwise,

provided by the defendants concerning this specific use of force.

      Turning to the second factor, the defendants assert that "Corp. Hudson only used

that force which was reasonably necessary to obtain Plaintiff's compliance."  (*Id.* at 10).

Their Memorandum further states:

In the instant matter, the situation at hand was simply not a single inmate refusing an order. Rather, by the Plaintiff's own testimony, there was general unrest in the Pod because Correctional Officers were searching each and every cell in Pod 5, as well as all cells in the Quilliams Units. The Plaintiff, despite the unrest in the Pod, refused to stop yelling, stop beating his door and go sit down. The Plaintiff's behavior not only added to the general unrest in the Pod, it also prevented these Correctional Officers from moving forward with the search for weapons and other contraband. Significantly, these searches turned up over 30 edged weapons in the possession of inmates housed in the segregation unit of a maximum security prison.

(*Id.* at 11). The defendants' Memorandum contains a string citation of cases where the deployment of pepper spray was found to be a reasonable use of force. (*Id.* at 10). The undersigned notes, however, that, unlike the instant case in which the plaintiff was enclosed in a segregation cell, in most of the cases cited by the defendants, the inmates were out of their cells and were in close proximity to correctional officers or other staff, thus placing at issue the immediate safety of those individuals. (*Id.*)

The defendants assert that the plaintiff cannot produce any objective evidence to support the third factor concerning the extent of any injury related to the alleged use of force. Although the plaintiff complained of temporary irritations and possible swelling, the defendants assert that he did not require any medical treatment and had no lasting injury.[6] (*Id.* at 11). Concerning the fourth factor, the defendants assert that Corp. Hudson reasonably perceived the plaintiff's conduct as a threat to the order and security of the prison because the plaintiff, an inmate with a violent history, refused an order while a disturbance was going on in a volatile environment. (*Id.*)

Finally, with regard to the fifth factor to be weighed, the defendants claim that Corp. Hudson "tempered his response." (*Id.*) The defendants contend that:

---

[6] The court notes, however, that, in *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court clarified that an absence of serious injury is but one factor to consider in the analysis of whether force was used in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm.

> In accordance with the Use of Force Model, Corp. Hudson could have
> employed a tazer [sic; Taser], a pepper ball or could have employed a bean
> bag round fired from a shotgun.  Despite the more invasive, painful and
> extreme measures available, the officer chose to exercise the least amount
> of force by deploying, in accordance with policy, two (2) one-second bursts
> of OC.

(*Id.* at 11-12).

Thus, the defendants assert that a proper weighing of the *Whitley* factors

supports a finding that Hudson's deployment of pepper spray into the plaintiff's

segregation cell was done in a good faith effort to maintain or restore discipline and

order and not maliciously or sadistically for the very purpose of causing harm.  (*Id.*)

The defendants also contend that the *Whitley* factors weigh in their favor

concerning the second use of pepper spray against the plaintiff on June 5, 2013.  (ECF

No. 117 at 12-14).  At the outset, Defendant Rhodes denies having any involvement in

either of these incidents; he specifically denies that he sprayed the plaintiff while he was

confined in the recreation yard sally port cage.  There is no evidence, sworn or

otherwise, offered by either party to support or dispute who was involved in this use of

force, and what actually occurred.

Nevertheless, the defendants assert that, regardless of who deployed that

chemical agent, it was an appropriate use of force.  (*Id.* at 12).  The defendants reiterate

that the environment on the segregation unit at MOCC at that time was highly volatile

and the staff was involved in mass cell searches in an effort to try to restore order to the

unit.  (*Id.*)  The defendants further contend:

> This need to restore order was warranted by the simple fact that thirty-two
> (32) make-shift weapons were confiscated within the Quilliams units.
> Additionally, the Plaintiff, who has a history of throwing fluid on
> Correctional Officers, a history of spitting on Correctional Officers, and
> who had just introduced urine to the area by relieving his bladder, was no
> longer behind a steel door but now housed in a confined area made up of

chain link fence.  As such, the ability of the Plaintiff to expel fluids towards a Correctional Officer had greatly increased.  Furthermore, despite being sprayed just earlier in the day for refusing orders, the Plaintiff again, by his own admission, was simply refusing clear orders.  As Plaintiff admitted in his deposition, he had a history of acting violent towards correctional officers when the situation presented itself.

(*Id.* at 12-13).

The defendants' Memorandum of Law further asserts that, under these circumstances, the defendant correctional officers reasonably perceived the actions of the plaintiff as a threat, and it is clear that they used only that force which was reasonably necessary to obtain the plaintiff's compliance.  (*Id.* at 13-14).  Accordingly, the defendants assert that there is no genuine issue of material fact, and that the defendants are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claims.

The defendants' Memorandum of Law further argues that the defendants are entitled to qualified immunity on the plaintiff's claims made against them in their individual capacities.  As noted in the defendants' Memorandum:

Federal authority on qualified immunity establishes that "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).  "[G]eneral functions as a correctional officer, like most law enforcement officers, are broadly characterized as discretionary, requiring the use of his discretionary judgments and decisions." *Cochran v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 2014 U.S. Dist. LEXIS 89893, *15-16 (S.D. W. Va. July 2, 2014) (*quoting West Virginia Regional Jail and Correctional Facility Authority v. A.B.*, No. 13-0037, 2014 W. Va. LEXIS 253, section III(A)(5) (Mar. 27, 2014).

In the instant action, it is clear that Corp. Hudson. Sgt. Miller, Maj. Rhodes and/or Sgt. Jarosz acted in accordance with the controlling WVDOC Policy, Policy Directive 312.02, and the Use of Force Model, on each occasion that Plaintiff was sprayed with two (2) one-second bursts of OC.  Additionally, it is clear that Corp. Hudson sprayed the Plaintiff during

the first incident, and Maj. Rhodes and/or Sgt. Jarosz sprayed Plaintiff during the second incident for the purpose of gaining compliance of the Plaintiff.

(ECF No. 117 at 14-15). Thus, the defendants assert that the plaintiff cannot establish any violation of a clearly-established constitutional right. (*Id.*)

The plaintiff's Response to the Motion for Summary Judgment largely repeats the factual allegations made in his Complaint surrounding the two incidents in which he was pepper sprayed; however, he further asserts that he had just been released from suicide watch and had been locked down for nearly a week when these incidents occurred. (ECF No. 121 at 5-9). He further persists in his belief that it was Major Rhodes who sprayed him the second time, and states that, after he was sprayed again, he requested a nurse, and defendant Jarosz just smiled and shook his head. (*Id.* at 8-9).

The plaintiff contends that both of these uses of force were arbitrary and punitive. His Response states:

> Order and discipline are important in running a correctional facility, but that does not authorize the arbitrary use of force, nor does it justify punitive use of force on difficult inmates not posing a real threat to others or raising security concerns. Not every instance of inmate resistance justifies the use of pepper spray and it should not be justified every time an inmate questions orders or seeks redress for an officer's actions.

(ECF No. 121 at 10-11). The plaintiff's Response further asserts that the law is clear that officers do not have a "blank check" to use force whenever a prisoner is being difficult. (*Id.* at 11). His Response states:

> A basis for an 8th Amendment claim so exists when as alleged here an officer uses pepper spray without warning on an inmate who is locked behind a door, who may have questioned his actions but who otherwise poses no threat. MOCC regulations authorize the use of pepper spray when an inmate is threatening physical harm . . . "chemical agents are dangerous, inflict pain and can cause permanent injury and even death, they are corporal punishment and absent clear and present danger of riotous proportions can never be justified when used against individual

15

prisoners in their cells." *See Landman v. Royster*, 333 F. Supp. 621 (E.D. Va. 1971).

(*Id.*)

Concerning defendant Hudson's conduct, the plaintiff maintains that "since [he] was locked in his cell, simply requesting mental health attention, he was absolutely no threat to himself or any other person [and] there was no need to use any force, chemical or physical." (*Id.* at 12). The plaintiff further contends that defendant Hudson wrote him up for a violation of refusing an order, but that charge was subsequently dismissed by the institutional hearing officer. (*Id.*)

Likewise, the plaintiff contends that he was not a significant security threat when he was sprayed the second time. His Response states:

> While it's true this Plaintiff has a lengthy prison record, that has nothing to do with this matter at hand. Neither does the fact that weapons were found in Quilliams II, because no weapons were found in this Plaintiff's cell or on his person, so that has nothing to do with this matter.
>
> The Plaintiff was locked behind a steel door, handcuffed behind his back with shackles on his ankles still suffering the affects [sic; effects] of the initial assault with chemical agents, being stuck in this plastic chair, soaked in his own urine after having been refused several times for a bathroom break, was forced to urinate on himself. The Plaintiff stood up and tried to stretch and was immediately assaulted by Defendant Rhodes with an enormous amount of chemical agents. This Defendant hosed the Plaintiff for nearly a full minute, even stopped, shook the canister, and kept spraying, then made the statement "Now you will sit in it." See Exhibit C (# 14).

(*Id.* at 15).

The plaintiff's Response further addresses the dispute concerning who allegedly sprayed him the second time.[7] He contends:

---

[7] The parties do not appear to dispute the fact that no incident reports were completed concerning this second alleged use of force; nor does there appear to be any audio or video evidence concerning either alleged use of force against the plaintiff on June 5, 2013. Thus, there appears to be no evidence, sworn or otherwise, to support or dispute the parties' positions concerning the second use of force.

> Throughout this entire action the Plaintiff and Defendants have been at odds with each other about who exactly sprayed the Plaintiff while he was locked in the Quilliams II Rec Yard stripout cage.  The Plaintiff has said it was Defendant Rhodes since the very beginning.  Please see Exhibit 1 (Grievance).  While the Defendants claim it was Defendant Jarosz who conveniently no longer works for the WVDOC.  Neither officer filed incident reports on the incident.  The Plaintiff was never written up for the incident.  No reports exist whatsoever on the incident that took place in the Quilliams II stripout cage.  Throughout this summary judgment motion the Defendants state "for purposes of this motion it does not matter the identity of the correctional officer that administered the OC."

(*Id.* at 16).  The plaintiff asserts that it is an important distinction as to whether Rhodes sprayed him because Rhodes has admitted in discovery that he does not believe that he was certified to carry OC at the time of this incident.  The plaintiff maintains that such a fact weighs against a finding that the force was used in good faith, and should result in a denial of qualified immunity to defendant Rhodes.  (*Id.* at 17-18).

For all of these reasons, the plaintiff asserts that there are genuine issues of material fact concerning the defendants' motivation for the uses of force against him on June 5, 2013, that the defendants are not entitled to qualified immunity on his claims, and that the defendants' Motion for Summary Judgment should be denied.

The defendants' Reply reiterates their argument that the uses of force by Corp. Hudson and Major Rhodes or Sgt. Jarosz[8] were proper under *Whitley v. Albers*, *supra.* (ECF No. 127 at 2-5).  The defendants further assert that the plaintiff has improperly attempted to limit the application of the Supreme Court's analysis in *Whitley* to instances involving a prison riot.  (*Id.* at 2-3).  The defendants' Reply further states:

> Important to the case at bar is the United States Supreme Court's holding that "where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the

---

[8] The defendants reiterate their position that it does not matter whether Major Rhodes or Sgt. Jarosz was the sprayer, as the use of force under the circumstances was reasonable and constitutional.  (ECF No. 127 at 6).

> question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21 (internal quotations omitted).

(*Id.* at 3).  The defendants further emphasize the following statement of the Supreme Court in *Whitley*:

> When the "ever-present potential for violent confrontation and conflagration," *Jones v. North Carolina Prisoners' Labor Union, Inc.* 433 U.S. 119, 132 (1977), ripens into *actual* unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman*, *supra*, at 349 n.14, carries a special weight.  "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security." *Bell v. Wolfish*, 441 U.S. at 547.  That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.  It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

475 U.S. at 321-22.  (ECF No. 127 at 3).

The undisputed evidence of record indicates that the correctional officers involved in these two incidents where force was used against the plaintiff had verbally ordered the plaintiff to move away from his door and to sit on his bunk, and to remain seated in the sally port cage.  The plaintiff acknowledges that he failed to comply with these orders at a very volatile time on the segregation unit, and that, at least prior to the second use of force, he was warned that his failure to comply with the officers' orders would result in him being sprayed with OC.  Applying the *Whitley* factors to the facts of this case viewed in the light most favorable to the plaintiff, the undersigned proposes that the presiding District Judge **FIND** that force was used against the plaintiff on June

18

5, 2013 in a good faith effort to restore order, and not maliciously or sadistically for the purpose of causing harm. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and that defendants Hudson, Rhodes and Jarosz are entitled to qualified immunity and judgment as a matter of law on the plaintiff's Eighth Amendment claims concerning the uses of force against the plaintiff on June 5, 2013.

### B. The plaintiff's Eight Amendment claim against defendant Miller also fails as a matter of law.

The plaintiff's factual allegations against defendant Miller appear to be limited to defendant Miller's opening of the plaintiff's beanhole to enable defendant Hudson to pepper spray him and his alleged suggestion that they "go get the pepperball gun." The defendants' Memorandum of Law asserts that the plaintiff cannot demonstrate that Sgt. Miller was deliberately indifferent to a substantial risk of serious harm to the plaintiff. The defendants' Memorandum further states:

> In the instant action, Plaintiff alleges that Sgt. Miller was deliberately indifferent in violation of the Eighth Amendment by "permitting Defendant Hudson access to my cell and then allowing him to spray me with mace." *See [ECF No. 117], Ex. D at Section V. "Relief," pp. 1.* The Plaintiff testified that his claims against Sgt. Miller are based upon Sgt. Miller's presence at Plaintiff's cell when Corp. Hudson deployed, in accordance with policy, two (2) one-second bursts of OC in order to gain Plaintiff's compliance; however, the Plaintiff has failed to present sufficient evidence to support his claim of deliberate indifference against Sgt. Miller, said allegation fails as a matter of law.

(ECF No. 117 at 17). The defendants' Memorandum of Law addresses this claim as one of supervisory liability, citing the Fourth Circuit's decision in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), in which the Court held that a supervisor may be liable for the actions of his subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations. Such

liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." 13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).[9]  The defendants' Memorandum asserts that, because the plaintiff has failed to prove that any use of force against him was excessive, his allegations against Sgt. Miller also fail as a matter of law.

The plaintiff asserts that the defendants have used the wrong standard in addressing his claim against defendant Miller.  The plaintiff asserts that Miller's conduct amounts to a failure to intervene by a by-stander.  His Response states:

> Law enforcement officers may be held liable not only for using excessive force but for failing to intervene when others are doing so, claims against by-standers are decided under the deliberate indifference standard.  However, by-standers must have a "<u>realistic opportunity</u>" to prevent or stop the unneeded force in order to be held liable.  *See Randall v. Prince Georges County MD*, 302 F.3d 188, 203-04 (4th Cir. 2002).  "Bystanding officer must actually see and permit unlawful conduct to be held liable.  *Rascon v. Hardiman*, 803 F.2d 269, 276-77 (7th Cir. 1986).  "I again tried to tell him (Hudson) my problem.  He (Hudson) looked over at (Defendant) Miller and said "<u>open this fuckin beanhole</u>."  (Defendant) Miller did and Hudson sprayed me directly in the face with a large amount of pepper spray and slammed my beanhole shut.  <u>See Exhibit C</u> (# 9).

> Prison personel [sic; personnel] may be held liable for their failure to act if it results in a constitutional violation.  Officer or supervisor can be held liable if they are present but fail to intervene when a prisoner is subjected to brutality.  Employees who know or should have known that a prisoner is being treated unconstitutionally may be held liable if they fail to do nothing [sic; anything] about it.

(ECF No. 121 at 18-19).

---

[9]   There is no evidence of record to demonstrate that defendant Miller, who is believed to have been a Sergeant at the time of these incidents, was a supervisor of defendant Hudson, whom the defendants identify as a Corporal.

The plaintiff further asserts that defendant Miller not only failed to intervene during defendant Hudson's attack on the plaintiff, but further denied that he was even present during that incident when he was called as a witness at the magistrate hearing on the plaintiff's alleged rules violations. (*Id.* at 19). The plaintiff contends that that defendant Miller's failure to assist him contributed to his physical injury and constituted the "unnecessary and wanton infliction of pain," in violation of the Eighth Amendment. (*Id.* at 19-20).

The defendants' Reply emphasizes that the plaintiff must prove that defendant Miller <u>knew</u> that Corp. Hudson was violating the plaintiff's constitutional rights, and that Hudson's actions were not a good faith effort to restore order. (ECF No. 127 at 8). The defendants further reiterate their position that there was no constitutional violation by defendant Hudson; thus, Sgt. Miller could not have <u>known</u> that Corp. Hudson was violating the plaintiff's constitutional rights. (*Id.*)

Because the undersigned has proposed that the presiding District Judge find that the conduct of defendant Hudson did not violate the plaintiff's Eighth Amendment rights, the undersigned further proposes that the presiding District Judge **FIND** that there also is no basis for Eighth Amendment liability against defendant Miller. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and that defendant Miller is entitled to qualified immunity and judgment as a matter of law on the plaintiff's Eighth Amendment claim against him.

**C.    Defendants Jarosz and Rhodes are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claims concerning the failure to provide medical treatment to the plaintiff.**

The plaintiff's Complaint alleges that defendants Rhodes and Jarosz failed to ensure that the plaintiff was provided with medical treatment after he was pepper sprayed the second time on June 5, 2013.  The defendants assert that the plaintiff has failed to offer any evidence that he was denied medical attention for a serious medical need by Sgt. Jarosz and Maj. Rhodes.  Their Memorandum further states:

> Plaintiff has failed to provide Defendants with any evidence that he was inflicted with a serious injury as a result of the incidents in question.  Although Plaintiff received treatment after being sprayed with OC, which can be considered evidence of a sufficiently serious injury.  Plaintiff cannot provide this Court with any evidence that any Defendant knowingly disregarded an excessive risk to inmate health or safety.  At the most, Plaintiff suffered skin irritation and a burning sensation was not averted, Defendants reasonably responded to the risk by decontaminating Plaintiff from the OC spray.

> Furthermore, Plaintiff has not and cannot provide any evidence that he has sustained a permanent or persistent injury as a result of either incident.  Again, the only harm suffered by Plaintiff consisted of temporary discomfort and a burning sensation as a result of a proper use of force to gain compliance due to Plaintiff's inability to follow orders.  Therefore, because Plaintiff cannot provide any evidence of and did not suffer a sufficiently serious injury, and Corp. Hudson, Sgt. Jarosz, and Maj. Rhodes were not deliberately indifferent to it, Plaintiff's claim of deliberate indifference towards a serious medical need must fail as a matter of law.

(ECF No. 117 at 18).

The plaintiff challenges the defendants' assertion that he needed no medical attention.  (ECF No. 121 at 17).  The plaintiff asserts that "the defendants never attempt[ed] to refute that he was left sitting in chemical agents for almost 2 hours" and he claims that such delay caused him substantial harm and pain.  (*Id.* at 23).  His Response further states:

I'm left handcuffed behind my back and shackles around the ankles, sitting in this chair locked in a cage . . . About an hour after this I'm having back and shoulder pain having to sit handcuffed behind my back, so I stand up to stretch, to see if I can get some of the pain and tightness out of my muscles . . . Defendant Jarosz bangs on the locked door and yells "sit the fuck back down" I try to explain how I'm hurting . . . the beanhole opened . . . I see Major Rhodes holding the mace can . . . he hosed me down. Almost a full minute long, he had to stop and shake the can so he could continue spraying me . . . Rhodes slammed the beanhole and said "Now you'll sit in it" You move again and I'll send this dog in there to chew you a new asshole boy" . . . I'm in so much pain, my head, my back it's in my ear, on my neck, dripping down into my anus and everything it was hurting so bad . . . I kept asking Jarosz please get me a nurse, I'm hurting.  Please get me a nurse, I'm begging for medical care and Jarosz simply smiles and shakes his head back and forth (in a no manner).  He and Major Rhodes made me wait for nearly two hours refusing to get me medical care . . . Please see Exhibit C # 12-15.

(*Id.* at 21-22).

The defendants' Reply contends that the plaintiff has offered nothing but his own self-serving allegations and testimony to demonstrate that he sat in pepper spray for nearly two hours without being decontaminated.  The defendants assert that the Fourth Circuit has recognized that "self-serving contentions . . . may be discounted as having no evidentiary support."  *See Riley v. Honeywell Tech. Solutions, Inc.*, 323 F. App'x 276 , 277 n.2 (4th Cir. 2009).  (ECF No. 127 at 6).  The defendants' Reply further states:

While the Defendants do not admit that Plaintiff was forced to sit covered in OC for nearly two hours without being decontaminated, had that happened, it was by Plaintiff's own doing.  Plaintiff notes that if an official delays in providing medical attention, then to determine if that was a violation of constitutional rights, the Court should consider both the reason for the delay and the nature of the medical need.  (*See* ECF No. 121, p. 15).  The reason for the alleged delay here is because Plaintiff created a disturbance during a period of unrest in the segregation units at Mount Olive.  Plaintiff disobeyed orders while mass cell searches were being conducted.  As a result, he had to be removed from his cell and decontaminated in the recreation yard.  This was the first incident.  While seated in the recreation yard after decontamination, Plaintiff, again, in a less secure environment, refused orders which caused him to be sprayed with OC yet again.  This was the second incident.  At this point, mass cell searches were still being conducted.  Defendants had nowhere else to

secure Defendant [sic; Plaintiff] in order to get him decontaminated all the while conducting cell searches which turned up over thirty (30) deadly weapons. Furthermore, the nature of the medical need was that Plaintiff needed to be decontaminated or washed off with water in order to help relieve a burning sensation from being sprayed with OC. Even with the decontamination, the burning sensation is not totally alleviated; it is merely reduced. Based upon the facts that Plaintiff caused any alleged delay in treatment and the nature of the treatment would simply reduce he burning sensation, Plaintiff's claim for denial of medical care fails.

(ECF No. 127 at 6-7).

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to establish that defendants Rhodes and Jarosz were deliberately indifferent to any serious medical need of the plaintiff. Accordingly, the undersigned further propose that the presiding District Judge **FIND** that these defendants are entitled to qualified immunity and judgment as a matter of law on the plaintiff's Eighth Amendment claims against them.

### D.    The plaintiff's assault and battery claims fail as a matter of law.

Finally, the defendants contend that the plaintiff's assault and battery claims, based upon the same facts supporting his Eighth Amendment excessive force claims, fail as a matter of law because the defendants were privileged to use such force against the plaintiff. (*Id.* at 18-19). Similar to their assertions concerning the plaintiff's Eighth Amendment claims, the defendants contend that:

It is widely recognized that prison guards may use chemical sprays when reasonably necessary to subdue an insubordinate prisoner because orders must be obeyed, and there are only so many choices available to correctional officers when an inmate refuses.

*Lewis v. White*, 2010 U.S. Dist. LEXIS 65765 (S.D. W. Va. 2010).[10] (ECF No. 117 at 19).

---

[10]   The undersigned could not locate a comparable Westlaw citation for this case.

Conversely, the plaintiff asserts that, because there was no justification for the two separate uses of force by defendants Hudson and Rhodes, those defendants committed an assault and battery against him. (*Id.* at 23-26). In pertinent part, his Response states, "[b]oth Defendant Rhodes and Hudson used excessive force in assaulting the Plaintiff with extraordinary amounts of chemical agents, when the Plaintiff posed no threat and was secure at both times." (*Id.* at 26). The defendants' Reply did not re-address this issue.

The plaintiff's claims of assault and battery are state law claims that are not actionable under section 1983. *See Gray v. Bd. of Cty. Commrs. of Frederick Cty., Md*, 551 F. App'x 666, 677 (4th Cir. 2014) (a constitutional claim of excess force and a state tort claim of assault and battery are based on distinct legal concepts and foundations). Under West Virginia law, the legal phrase "assault and battery" is used to refer to the tort of battery. *See Smith v. Berlin*, 2014 WL 4929468 *8 (S.D. W. Va. Sept. 30, 2014). The *Smith* decision further enumerates the essential elements of a battery claim, as described in the Restatement (Second) of Torts, § 13 (1965) as follows:

> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of another or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*See also, Tolliver v. Kroger, Co.*, 498 S.E.2d 702, 710 (W. Va. 1997) (quoting Syl. Pt. 1, *Funeral Services by Gregory, Inc. v. Bluefield Cmty. Hosp.*, 413 S.E.2d. 79 (W. Va. 1991) ("In order to be liable for a battery, actor must act with the intention of causing a harmful or offensive contact with a person."), overruled on other grounds by *Courtney v. Courtney*, 437 S.E.2d 436 (W. Va. 1993)).

Based upon the undersigned's prior proposed findings that the force used against the plaintiff was applied in a good faith effort to restore order, the undersigned further propose that the presiding District Judge **FIND** that the defendants were privileged to use such force and, therefore, as a matter of law, the plaintiff cannot demonstrate that the deployment of pepper spray was done with an intent by the defendants to cause a harmful or offensive contact with the plaintiff in order to successfully state a claim of assault and/or battery.

### **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 116), and dismiss this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the district court and a waiver of appellate review by the circuit court of appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474

U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff and to transmit a copy to counsel of record.


 July 30, 2015

Dwane L. Tinsley
United States Magistrate Judge